UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANTWOAN SASHINGTON                          CIVIL ACTION

VERSUS                                      NO: 17-557

GEORGIA-PACIFIC LLC                         SECTION: "J"(4)

## ORDER AND REASONS

Before the Court is a *Motion for Summary Judgment* **(Rec. Doc. 76)** filed by Defendant, Georgia-Pacific LLC ("GP"). Plaintiff has filed an opposition (Rec. Doc. 80) and Defendant has also filed a reply (Rec. Doc. 83). Having considered the Motion and legal memoranda, the record, and the applicable law, the Court finds that the Motion should be **GRANTED in part** and **DENIED in part**.

## FACTS AND PROCEDURAL BACKGROUND

This litigation derives from an accident at a paper mill that injured Plaintiff, Antwoan L. Sashington, an employee of Envirovac Holdings, LLC ("Envirovac").[1] Defendant operates the mill in Zachary, Louisiana. The mill uses a number of multi-story boilers in its day to day operations to generate steam power and to reduce environmental emissions. In January of 2017, one of these boilers, Power Boiler #6 (the "boiler"), became sufficiently congested that it had to be shut down. Plaintiff became injured while contracted to clean out this boiler.

---

[1] Envirovac is a party to this suit only in the capacity of an intervenor, seeking a reduction of worker's compensation payments already paid and to be paid to Plaintiff in the future. Envirovac—with its insurer—seeks a total or partial reduction of these payments depending upon determination of Defendant's liability.

1

The boiler is primarily composed of a 250 foot furnace, and two almost equally as tall cylindrically shaped "cyclones." A cross-over duct connects the upper area of the furnace to the upper area of a cyclone, and a loop seal connects the bottom of a cyclone to the bottom area of the furnace; the result is a loop through which hot air, fuel, and fuel byproducts circulate. Petroleum coke and bark are burned in the furnace and the resulting ash and particulate matter is thrust towards the top of the furnace, through the cross-over duct and into the cyclones. Emissions are released from stacks extending out the top of the cyclones. Larger pieces of ash and particulate fall back down into a cyclone and pass through the funnel-shaped loop seal to re-enter the furnace. The ash and particulate material can become stuck in the cyclone and the loop seal. Eventually, this combination of ash and particulate will consolidate into an "agglomeration," a material as hard as concrete. When sufficient agglomeration forms in the cyclone and loop seal, the boiler becomes choked, and it must be shut down until the agglomeration is cleared.

Emails and testimony by GP personnel shows that the boiler was shut down on January 2, 2017. GP does not have the capacity to remove agglomerations from its boiler. They are so hard that they must be exploded with dynamite, although Defendant has attempted to remove agglomerations in the past using water shot from fire hoses. Defendant therefore regularly hires independent contractors to remove the agglomerations. After this particular agglomeration formed, Defendant quickly

contracted with N.B. Harty to explode the agglomeration with dynamite and Envirovac to remove the resulting debris.

These two teams worked in tandem. N.B. Harty would set charges in the agglomerated material from access points on the sixth, fourth, and third floors of the cyclone and the loop seal. (Rec. Doc. 76-1 at 4). After the agglomeration was exploded with dynamite, debris would fall down into the loop seal, where it had to be cleared away by Envirovac employees with vacuum hoses, shovels and hoes. On January 6, 2017, Plaintiff was on the Envirovac work crew which was tasked with removing the debris from the loop seal. For this job, none of the Envirovac crew, including Plaintiff, was required to enter the loop seal. They worked outside the loop seal from a small platform, the 2½ platform—so-called because it is located between the second and third floors of the boiler. The inside of the loop seal is accessible from the platform by a manhole.

The 2½ platform is only accessible by a short ladder extending from the third floor. Before it began the work of removing debris, Envirovac marked off a "safe work area" on the third floor, which included the 2½ platform and the loop seal at the center. Envirovac safety supervisors, Joe Adams and Michael Simerly, testified that within this area all Envirovac employees were required to wear personal protective equipment ("PPE"). (Rec. Doc. 76-5 at 121-22). Among the many items of protective equipment that were assigned for this job on the safety worksheet were a pair of gloves, a faceshield, hardhat, goggles, safety glasses, and a Tyvek—a white fire retardant suit worn over an Envirovac employees' clothing. (Rec. Doc. 76-5 at 47, 68).

Removing any of these items within the marked off area would have violated Envirovac's safety policies. (Rec. Doc. 76-6 at 157).

At approximately 3:45 a.m. on January 6, 2017, Plaintiff was on the 2½ platform when Jack Duff—Envirovac employee and Plaintiff's jobsite supervisor—hit a rock of debris within the loop seal with the hoe he had extended through the open manhole. (Rec. Doc. 76-7 at 16). Duff then heard an intake of air which he correctly believed was an indication that debris was falling down into the loop seal. Duff also correctly predicted that the loop seal would expel ash through the open manhole as a result of the agglomeration debris making contact with the ash. Duff testified that he attempted to warn Plaintiff to exit the platform, but it was too late. When the debris impacted, hot ash quickly exited the manhole and engulfed Plaintiff. Unfortunately, Plaintiff had removed his protective gloves and his face mask and his hands and face were severely burned by the hot ash. Medical records show that Plaintiff was diagnosed as suffering severe chemical burns on 14% of the total surface area of his body. (Rec. Doc. 80-5). Plaintiff had to undergo debridement and grafting procedures as a result of his injuries.

What ultimately caused the agglomeration to destabilize, fall to the loop seal, eject hot ash from the manhole, and engulf the Plaintiff in hot ash is not clear. Plaintiff asserts that the debris was made to fall by GP personnel who sprayed water on an agglomeration from a higher platform before Plaintiff began working. (Rec. Doc. 29). When water is sprayed onto agglomeration, it can cause cracking and splitting, and a portion may slake off and fall down into the loop seal. Plaintiff theorizes that

4

Defendant destabilized an agglomeration with water in this way, leaving it to fall when it did, thereby injuring Plaintiff. Alternatively, the agglomeration may have been destabilized during the dynamiting operation by the N.B. Harty team. Finally, Jack Duff testified that he originally believed that it was he who destabilized the agglomeration, when he made contact with a rock in the loop seal with his hoe. (Rec. Doc. 76-7 at 23). Any of these acts, or conceivably a combination of all three of them, may have in effect caused the ash to spill out of the manhole and injure the Plaintiff.

Plaintiff subsequently filed suit alleging that Defendant's negligence caused his injuries. Defendant then filed its Motion for Summary Judgment.

## **LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)), *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be

satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

When examining matters of state law, this Court will employ the principles of interpretation used by the state's highest court. *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010). Mindful of Louisiana's distinction between primary and secondary sources of law, the Court will begin its analyses with reliance on the Louisiana Constitution and statutes before looking to "jurisprudence, doctrine, conventional usages, and equity, [which] may guide the court in reaching a decision in the absence of legislation and custom." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 547 (5th Cir. 2004) (quoting La. Civ. Code. art. 1 rev. cmt. b). If the Court must make an "Erie guess" on an issue of Louisiana law, the Court will decide the issue the way that it believes the Supreme Court of Louisiana would decide it. *Id.* (citation omitted). This Court is not strictly bound by the decisions of the state intermediate courts and will disregard them if the

Court is "convinced that the Louisiana Supreme Court would decide otherwise." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007).

## DISCUSSION

Plaintiff asserts that Defendant was negligent because: (1) Defendant's "improvident use of a fire hose [which] created an unreasonably dangerous risk of falling agglomeration while Plaintiff was inside the boiler" and (2) Defendant "fail[ed] to ensure Plaintiff's work area inside of the number 6 power boiler was reasonably safe for Plaintiff to perform his work duties." (Rec. Doc. 29 at 4). Defendant's duty to provide a safe work environment generally depends in part on the relationship between a principal and its independent contractor and is therefore reserved for the discussion of the independent contractor defense, the operational control exception, and vicarious liability in Part II. Plaintiff does not dispute that Envirovac was Defendant's independent contractor because the requirements for that status are clearly met; "a valid contract exists between the parties and that the contract calls for specific piece work as a unit which can be accomplished by non-exclusive means." *Perkins v. Gregory Mfg. Co.*, 671 So. 2d 1036, 1039 (La. App. 3d Cir. 1996), writ denied, 673 So. 2d 1039 (La. 1996).

### I. DEFENDANT'S ALLEGED USE OF THE FIRE HOSE

Plaintiff alleges that the actual cause of the accident was a piece of debris that fell into hot ash because the debris was destabilized from an agglomeration by GP personnel who sprayed the agglomeration with water. According to the Louisiana Civil Code, "[e]very act whatever of man that causes damage to another obliges him

7

by whose fault it happened to repair it." La. Civ. Code Ann. art. 2315. "Literally interpreted, a tortfeasor may be held liable under Article 2315 for any damage remotely caused by his or her fault." *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. CIV.A. 13-0366, 2015 WL 6758258, at *16 (E.D. La. Nov. 5, 2015). However, "as a matter of policy, the courts, under the scope of duty element of the duty-risk analysis, have established limitations on the extent of damages for which a tortfeasor is liable." *Id.* (quoting *Severn Place Associates v. Am. Bldg. Services, Inc.*, 930 So. 2d 125, 127 (La. App. 5th Cir. 2006)). Indeed, to succeed at trial, Plaintiff must prove all five elements of a negligence claim: (1) defendant owed a duty to plaintiff and (2) breached that duty, (3) with that breach being the cause-in-fact, (4) and legal cause (5) of actual damages. *Roberts v. Benoit*, 605 So. 2d 1032, 1051 (La. 1991), on reh'g (May 28, 1992).

Defendant vigorously denies that the allegedly negligent act of spraying water ever happened, arguing that if water had been sprayed in the manner described by Plaintiff, the resulting steam and hydrogen sulfide gas would have killed the GP personnel responsible. (Rec. Doc. 76-1 at 21) ("That [GP supervisor, Philip] Jacobs was able to give a deposition, is proof enough that water was not used . . . ."). Although, GP's personnel do absolutely deny ever shooting water into the boiler, other witnesses contradict this testimony. Jack Duff, Plaintiff's Envirovac supervisor on the 2½ platform, testified that he actually turned on the hose at Philip Jacobs's request, so that the GP staff could spray down agglomerations in the cyclone. (Rec. Doc. 76-7 at 22). This testimony is corroborated by an employee at N.B. Harty who

8

was supervising the blasting job.[2] Therefore, whether water was used in the boiler unquestionably presents an issue of fact. The only question is whether the issue of fact is material. *See U.S. v. Sumitomo Shoji, New York, Inc.*, 534 F.2d 320, 324 (Cust. & Pat. App. 1976) (finding an issue of fact not relevant to resolution of controlling legal issue was not "material" and therefore did not preclude summary judgment).

Defendant argues that who or what caused the debris to fall is not material because Defendant did not "owe Plaintiff a duty to protect Plaintiff from inherent risks of Plaintiff's job." (Rec. Doc. 76-1) (citing *Perkins*, 671 So. 2d at 1039). In *Perkins v. Gregory Manufacturing Co.*, the Louisiana Third Circuit upheld a grant of summary judgment in a case with facts similar to what is alleged here. 671 So. 2d at 1037. In *Perkins*, a property owner hired an independent contractor to harvest timber on its land. This independent contractor—through an intermediary—hired Perkins as a tree trimmer. A few hours into the job a tree—felled as part of logging operation—injured Perkins. *Id.* Perkins sued, claiming the principal-landowner was

---

[2] Defendant points out that that employee, Blake Worthy, later seemingly clarified that he did not actually see water being put into the boiler by Georgia-Pacific. Rather, he says he was told by GP personnel that they could use water to blast off agglomeration that his blasting team could not reach. (Rec. Doc. 76-13 at 92-93). GP argues that the corroborating statements by Blake Worthy constitute inadmissible hearsay under Fed. R. Evid. 801, and his statements are therefore not competent summary judgment evidence. *See Brown v. Zurich Am. Ins. Co.*, No. CV 16-12207, 2018 WL 3374163, at *1 (E.D. La. July 11, 2018). However, a statement is not hearsay if it was made by a party's employee regarding a matter within the scope of his employment. Fed. R. Evid. 801(d)(2)(D). Blake Worthy testified at deposition that it was GP supervisor, Jacobs, who said to him, "I can call Craig [Barfield] and see about putting water on [the agglomeration]." (Rec. Doc. 80-10 at 64). He further testified that after this conversation he stood by while "they was running hoses in and they put water on it." (Rec. Doc. 80-10 at 65). It is unclear then how much of Worthy's testimony is based on personal observation and how much of it is based on conversations with GP's personnel. It makes no difference here however, as neither is hearsay. Defendant, as movant, has not met its burden of demonstrating that the evidence will not be admissible at trial. *See Martin v. John W. Stone Oil Distributor, Inc.*, 819 F.2d 547, 549 (5th Cir. 1987). Accordingly, the evidence is properly before the Court for purposes of summary judgment.

responsible for the actions of its independent contractor under an operational control theory, but the court rejected that argument. *Id.* at 1040. Perkins argued in the alternative that the principal-landowner was independently negligent for its own failure to provide a safe place work environment. *Id.* The court rejected this argument too. The Third Circuit found that while a principal does have a duty to provide a safe work environment, that duty only extends to risks that are "extrinsic" from the job contracted to be performed. *Id.* For example, a construction company owes a duty of safe passage to its contractors as they travel from the company parking lot to the work site. *See Donavan v. Jones*, 658 So. 2d 755, 767 (La. App. 2d Cir. 1995). On the other hand, the harm of a tree falling was "a danger inherent with the job of a tree trimmer and a risk associated with a logging operation." *Perkins*, 671 So. 2d at 1040. Thus, because the "principal does not owe a duty to protect the contractor's employees from risks inherent to the job," the court upheld the district court's decision granting summary judgment against Perkins. *Id.*

Similar to *Perkins*, the harm suffered by Plaintiff—engulfment in hot ash—was a byproduct of dangers inherent to the job of removing debris and ash from a massive industrial boiler.[3] However, the circumstances here are distinct from those in *Perkins* in at least one critical regard. Here, the conduct purported to have caused

---

[3] The Jobsite Tailgate Safety & Environmental Worksheet (Rec. Doc. 76-5 at 65-68) shows that Envirovac personnel were alerted to these risks before beginning the job. Both "engulfment" and "heat exposure" are marked on the worksheet as anticipated hazards. Corresponding with these risks, Envirovac employees were required to wear heat resistant personal protection equipment. (Rec. Doc. 76-5 at 65-68). All Envirovac employees on the job site, including Plaintiff, signed this safety sheet, indicating they understood these risks. The creator of the worksheet, Jack Duff, agreed that the risks of heat exposure, engulfment in ash, and falling material were inherent to the job to be performed. (Rec. Doc. 76-7 at 26).

10

the injury was allegedly committed by the Defendant itself, not by Defendant's independent contractor. In *Perkins*, the principal-landowner did not cut down the tree that injured the plaintiff by its own hand. *See Perkins*, 671 So. 2d at 1037. The Court does not take *Perkins* to stand for the proposition that the independent contractor defense shields a principal from all harms inherent to a job regardless of who actually caused the harm. Indeed, that is the reasoning for the operational control exception to the contractor defense that the Court will address in Part II.

Therefore, the Court finds that Defendant owed a duty of care to proceed reasonably to the extent that Defendant itself engaged in removing agglomerations. The Court reserves the question of whether Defendant actually engaged in the alleged conduct and whether the alleged conduct breached Defendant's duty for the trier of fact.

## II. THE DUTY TO PROVIDE A SAFE WORK ENVIRONMENT

Plaintiffs also claim more generally in their amended complaint that Defendant is liable in negligence for "failing to ensure that Plaintiff's assigned work area inside of the number 6 power boiler was reasonably safe for Plaintiff to perform his work duties." (Rec. Doc. 29 at 4). Defendant rejects that it owed any such duty to the employees of its independent contractor. Defendant also apparently interpreted Plaintiff's allegation to include a possible claim that Defendant is liable for the negligent acts of its independent contractor, Envirovac. Defendant devoted a significant portion of its original memorandum arguing that the independent

contractor defense also defeats any claim of vicarious liability and that an exception to this defense, operational control theory, is not applicable. (Rec. Doc. 76-1).[4]

### a. Defendant's Liability for Envirovac's Failure to Provide a Safe Work Environment

Pursuant to the independent contractor defense, "a principal, such as [GP], cannot be liable for injuries resulting from the negligent acts of an independent contractor, such as [Envirovac], unless (1) the liability arises from ultrahazardous activities performed by the contractor on behalf of the principal or (2) the principal retains operational control over the contractor's acts or expressly or impliedly authorizes those acts." *Coulter v. Texaco, Inc.*, 117 F.3d 909, 911–12 (5th Cir. 1997). Here, although blasting with dynamite constitutes an ultrahazardous activity, Plaintiff does not contend this exception applies and the Court need not consider it. Rather, Plaintiff argues that GP retained control or authorized Envirovac's activities which resulted in Plaintiff's injuries.

The Court begins any analysis of the operational control exception with an examination of the contract to determine whether and to what extent a right to

---

[4] In its reply, Defendant argues that Plaintiff failed to allege that GP was vicariously liable for Envirovac's negligence and that the operational control exception should not even be considered on this motion for summary judgment. (Rec. Doc. 83-1 at 9). As a preliminary matter, the Court must determine whether a vicarious liability claim is sufficiently pleaded to be properly before the Court. It is true that "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of Louisiana State U.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir.1990)). Here however, Defendant was the first to bring up operational control theory in its own Motion. Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement" sufficient to give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 337 (2005) (citation omitted). Defendant candidly acknowledges that it anticipated the operational control argument, apparently solely on the basis of Plaintiff's complaint. Obviously then, Defendant had sufficient notice of the underlying claim before Plaintiff filed his opposition. The Court will consider whether the operational control theory applies, because it is clear that Defendant will not be prejudiced.

control work has been reserved by the principal. *Id.* at 912. Although, the terms of the contract are not totally dispositive, see *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. CIV.A. 13-0366, 2015 WL 6758258, at *14 (E.D. La. Nov. 5, 2015), they are afforded great weight. *See Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550–51 (5th Cir. 1987) (quoting *Hemphill v. State Farm Ins. Co.*, 472 So. 2d 320 (La. App. 3d Cir. 1985)) ("[T]he 'control' determination 'depends in great measure upon whether and to what degree the right to control the work has been contractually reserved by the principal. The supervision and control which is actually exercised by the principal is less significant.'"). A principal is not required to guarantee that it will turn a blind eye to all of its contractor's activities. "[T]he fact that a principal . . . reserves the right to monitor its contractor's performance and stations a 'company man' on the platform who observes the contractor's activities, has the right to make safety recommendations to the contractor, and is obligated to report continuing unsafe work practices or conditions to his . . . superiors, does not mean that the principal controls the methods or details of the contractor's work." *Coulter*, 117 F.3d at 912.

Here, the Master Purchase Agreement ("Agreement") states that "[Envirovac] is an independent contractor" and not an "employee." (Rec. Doc. 76-12 at 12). It further states that Envirovac "shall furnish and pay for all labor, work, supervision, Parts and Materials, equipment, tools, apparatuses, utilities and other items necessary to perform Services." (Rec. Doc. 76-12 at 3). Further, the Agreement states, "notwithstanding any specifications or other expressed descriptions of Services to be

13

performed hereunder, GP is relying on [Envirovac's] skill and judgment to provide such Services." Also, "[Envirovac] shall provide its employees with all training (including without limitation hazard communication training) and personal protective equipment necessary for them to perform the Services in a safe and efficient manner." It requires Envirovac to familiarize its employees with OSHA requirements and GP safety rules. (Rec. Doc. 76-12 at 13). Finally, the Agreement specifically requires Envirovac to stop work upon discovering any unsafe working environment and give notice of the unsafe conditions to GP. (Rec. Doc. 76-12 at 13).

Clearly the terms of the Agreement do not reserve sufficient rights of control or supervision to GP to give rise to any inference that Defendant had operational control of the job. Therefore, the only issue is whether GP took operational control by actually exercising step-by-step supervision or control of the job or by ordering Plaintiff to engage in unsafe work practices. *See Dixon v. Danos and Curole Marine Contractors, Inc.*, No. CIV.A. 97-2611, 1998 WL 812393, at *2 (E.D. La. Nov. 16, 1998). The U.S. Fifth Circuit has relied on the Second Restatement of Torts to establish what is necessary for liability to attach in this circumstance:

> In order for [a principal] to be liable for the actions of an [independent contractor], the [principal] must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations. Such a general right is usually reserved to employers, but this does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of right of supervision that the contractor is not entirely free to do the work in his own way.

*Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989) (quoting RESTATEMENT (SECOND) OF TORTS § 414, com. c). Accordingly, the Fifth Circuit has found that a principal can give instructions to an independent contractor on *what* to do, so long as the principal doesn't tell the contractor "*how* to do his job." *Id.* (emphasis added). The distinction courts have found is that supervision and direction do not indicate operational control where the principal is only interested in the result. *See Graham v. Amoco Oil Co.*, 21 F.3d 643, 646 (5th Cir. 1994) (citing *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550–51 (5th Cir. 1987)

Furthermore, liability does not arise because a principal takes an active interest in the safety exercised in its facility. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193 (5th Cir. 1991) (finding principal not liable where principal's "company man" held safety meeting in conjunction with the independent contractor, and even "had a hand in removing" an independent contractor the company man watched behave in an unsafe manner).

### 1. Operational Control by Step-by-Step Supervision

Plaintiff argues that GP's "company man," Philip Jacobs, exercised a step-by-step supervision of Envirovac by doing the following: (1) telling Envirovac when they could resume working from the 2½ platform through inspections and a safe work permitting process and (2) controlling the blasting operation by denying a request by N.B. Harty to drill holes in the cyclone for easier access to agglomerations. The Court need not address this second argument. To the extent GP's instruction regarding drill holes exhibits any indication of GP assuming operational control, it would be over

N.B. Harty's blasting job and not Envirovac's job of removing debris. It is not relevant to the inquiry currently before the Court.

Plaintiff emphasizes repeatedly that Defendant controlled when Envirovac worked because Philip Jacobs would sometimes give an all clear after N.B. Harty's blasting work and because GP required Envirovac to obtain a safety permit before beginning a job. But a "general right to order the work stopped or resumed" is not sufficient for liability to attach. *Landry*, 889 F.2d at 1471. The Court disagrees that controlling when Envirovac worked is the same as "exercising direct supervision over the step-by-step process of accomplishing the work of the Envirovac crew." (Rec. Doc. 80 at 13). A contractor is "free to do the work in his own way" if he retains autonomy over *how* he accomplishes his task, even if not *when*. *Id.* And Jack Duff, the Envirovac supervisor on the 2½ platform testified that GP never told him or his crew how to do their job. (Rec. Doc. 76-7 at 26).

This Court's decision in *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.* is not to the contrary. 2015 WL 6758258, at *15. Plaintiff suggests that another section of this Court found a material issue of fact in determining operational control because the Court relied in part on an email from a principal stating, "[w]e are stopping the job at WD32 from going into the construction phase and we are sending the crew back in." (Rec. Doc. 80 at 14). Plaintiff argues that this indicates that controlling when an independent contractor works may give rise to operational control. However, Plaintiff omits the second half of the quote which indicates the real issue presented by that email: the principal appeared to be exercising control over

16

what methods the independent contractor would use in accomplishing its task. *Tajonera*, 2015 WL 6758258, at *15-16 (finding a disputed issue of material fact as to whether principal approved a more hazardous work plan involving welding).

## 2. Express or Implied Order Exception

Plaintiff also argues that Defendant "gave Envirovac the order to engage in" the practice of not wearing gloves and a facemask on the 2 ½ platform by issuing work safety permits that did not indicate "hot/cold burns" or "falling/flying debris" as hazards and by failing to give Envirovac proper training on these hazards. (Rec. Doc. 80 at 15). The Fifth Circuit has held that a principal is liable for the acts of an independent contractor if it "expressly or impliedly authorizes an unsafe practice." *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 329 (5th Cir. 1987). The statement that a principal can be found liable for "impliedly authorizing" an unsafe work practice appears not infrequently in Louisiana case law. *See, e.g.*, *Williams v. Gervais F. Favrot Co.*, 499 So. 2d 623, 625 (La. App. 4th Cir. 1986), writ denied, 503 So. 2d 19 (La. 1987). However, in practice Courts have tended to find that a failure by a principal to intercede in the unsafe work practices of an independent contractor does not render the principal liable. For example, in *Graham v. Amoco Oil Co.*, the Fifth Circuit found that the terms of a contract placed the burden to implement safe procedures on the independent contractor. 21 F.3d 643, 648 (5th Cir. 1994) Accordingly, the Court of Appeals found that the independent contractor was not required to take corrective actions merely because the principal's representative observed unsafe work practices on the part of the independent contractor. *Id.*; *see also*

*Kent v. Gulf States Utilities Co.*, 418 So. 2d 493, 500 (La. 1982) (finding that even though principal's representative could have prevented the accident, he had no duty to do so), *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997) (declining to find that principal was liable for a crane collapse merely because principal had authorized a crane be repositioned because the independent contractor was not prevented from making adjustments after it was clear that the crane had been destabilized).

Generally, courts only find that a principal has assumed a duty if the principal explicitly orders or endorses an unsafe work practice. That was the circumstance in the case cited by Plaintiff, *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 329. In *Bartholomew* there was uncontroverted testimony that the principal had ordered its independent contractor not to clean up the muddy floor in order to save time. *Id.* at 327-29. When the employee of the independent contractor slipped on the muddy floor, the principal was found to be liable. *Id.*

Here, as in *Graham*, the Agreement assigned Envirovac the responsibility to establish safety procedures and provide training and equipment to its employees. It is therefore unsurprising that Defendant did not "have any written safety policies or procedures that discussed the hazards associated with the job of clearing agglomeration out of the loop seal." (Rec. Doc. 80 at 15). If Defendant had replaced Envirovac's safety policies and procedures with its own, that action would most likely have constituted an act of operational control. *See Crane v. Exxon Corp., U.S.A.*, 613 So. 2d 214, 221 (La. App. 1st Cir. 1992), as amended, 633 So. 2d 636 (La. App. 1st Cir. 1993). To the contrary, GP allowed Envirovac to control its work environment and its

safety procedures and never controlled what equipment Plaintiff wore or where he wore it. (Rec. Doc. 76-7 at 27). It was Jack Duff who filled out the safety worksheet which diagnosed hazards and prescribed equipment for Envirovac employees, including Plaintiff. (Rec. Doc. 76-7 at 27). Duff gave no countenance to any hazards omitted on the GP work permit. In compliance with the Agreement, he conducted his own hazard analysis. To the extent that Envirovac's equipment and direction was deficient, it was not Defendant's duty to supplement with its own safety protocols. *See Graham*, 21 F.3d at 648. To hold otherwise would be to render the independent contractor defense meaningless.

Both by the terms of the Agreement, and by actual practice, it was Envirovac who controlled how it accomplished its task and what safety procedures and it equipment it used. The Defendant is not liable for any negligence on the part of Envirovac.

### b. Defendant's Own Duty to Provide a Safe Work Environment Generally

The Court already found that a material issue of fact exists as to whether the Defendant itself engaged in using water to make agglomerations fall. Moreover, the Court does not disagree with Plaintiff's general statement that "an owner or operator of a facility owes a duty to employees of independent contractors to take reasonable steps to ensure a safe working environment." (Rec. Doc. 80 at 16). However, now that the Court has held that the independent contractor defense applies, the Court finds it is necessary to note that this duty to the employees of the independent contractor is narrow and limited to certain "extrinsic" dangers and harms that GP itself caused

19

through its own actions. Besides the allegation that GP itself caused the harm by spraying water on agglomerations, Plaintiff does not allege any breaches of a duty owed by Defendant. As discussed above, pursuant to the Agreement which established Envirovac as Defendant's independent contractor, it was Envirovac and Envirovac alone who owed a duty to ensure its employees could perform the job of removing debris from the boiler safely. Nor did GP voluntarily assume a duty by virtue of its work safety permit process. Therefore, Defendant cannot be held liable for the alleged negligent acts of failing to properly train or to provide a ramp to the 2½ platform.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's *Motion for Summary Judgment* **(Rec. Doc. 76)** is **GRANTED in part** to dismiss all claims of vicarious liability against Defendant for the alleged negligent conduct of Envirovac and **DENIED in part** to the extent it applies to Plaintiff's allegation that Defendant negligently caused the agglomeration to fall by use of a fire hose.

New Orleans, Louisiana, this 19th day of September, 2018.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE